IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

MAR 1 3 2007

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| AMERICAN REGISTRY OF RADIOLOGIC TECHNOLOGISTS, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. B-05-287 |
| MANUEL O. GARZA, | § § | |
| Defendant. | § § | |

## OPINION & ORDER

BE IT REMEMBERED that on March 1̱3̱, 2007, the Court **DENIED** Plaintiff American Registry of Radiologic Technologists' Rule 59(e) Motion to Amend Judgment. Dkt. No. 16.

### I.    Background

Plaintiff, the American Registry of Radiologic Technologists ("ARRT"), first filed its complaint against Defendant, Manuel O. Garza, on November 8, 2005. Dkt. No. 1. The factual background giving rise to this complaint can be found in the Court's Opinion & Order of May 12, 2006 and is hereby incorporated by reference in this Opinion. Dkt. No. 13.

Plaintiff served Defendant with process on November 22, 2005. Dkt. No. 9. Defendant never answered or otherwise appeared in this action. As a result, ARRT moved for default judgment against Defendant on January 24, 2006. Dkt. No. 10. Pursuant to Federal Rule of Civil Procedure 55(a), the Court Clerk entered default against Defendant on January 27, 2006. Dkt. No. 11. ARRT then proceeded to move for default judgment on March 15, 2006. Dkt. No. 12.

On May 12, 2006, the Court granted in part and denied in part Plaintiff's motion

-1-

for default judgment. Dkt. No. 13. Default judgment was granted on Plaintiff's claims under 15 U.S.C. § 1125, but it was denied on Plaintiff's claims under 15 U.S.C. § 1114. *Id.* Final judgment was entered in this case on May 15, 2006. Dkt. No. 15.

ARRT objected to the Court's denial of its claims under 15 U.S.C. § 1114 by filing the motion *sub judice* on May 30, 2006. Dkt. No. 16. In this motion, Plaintiff "seeks a clarification of the law[] and an amendment of the Court's Opinion & Order" of May 12, 2006. *Id.* at 1. Specifically, Plaintiff moves the Court, pursuant to Federal Rule of Civil Procedure 59(e), to reconsider its holding which denied Plaintiff's motion for default judgment pursuant to 15 U.S.C. § 1114. *Id.* Plaintiff reasserts its contention that Defendant violated this statutory provision, and it provides additional support and authority for its position. *Id.* at 1, 4–7.

## II.    Standard

Motions under Rule 59(e) "call[] into question the correctness of a judgment." Templet v. Hydrochem Inc., 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re* Transtexas Gas Corp., 303 F.3d 571, 581 (5th Cir. 2002)). In making the determination of whether to reconsider its judgment, a court must balance two opposing needs: the need for finality of litigation and the need to render just decisions based upon all of the facts. *Templet*, 367 F.3d at 478; Mata v. Cameron County, Texas, No. C.A. B-04-92, 2005 WL 2146078, *1 (S.D. Tex. Sept. 2, 2005). However, once a judgment has been entered, reconsideration of that judgment is "an extraordinary remedy that should be used sparingly." *Templet*, 367 F.3d at 478; *Mata*, 2005 WL 2146078, at *1.

To prevail upon a Rule 59(e) motion, the movant must establish the existence of an appropriate basis for reconsideration. *See Mata*, 2005 WL 2146078, at *1. The two most prevalent bases are a need "to correct manifest errors of law or fact" and the discovery of new or previously unavailable evidence. *Templet*, 367 F.3d at 479; *Mata*, 2005 WL 2146078, at *1. Additionally, reconsideration may be appropriate if it is "necessary in order to prevent manifest injustice" or if there has been "an intervening change in controlling law." *Mata*, 2005 WL 2146078, at *1. If the movant fails to establish any of these factors, a motion to alter or amend should be denied. *Id.* Even if

the movant successfully proves that one of these factors exists, the Court has considerable discretion to determine whether reconsideration of its judgment is warranted. *See Templet*, 367 F.3d at 479; *Mata*, 2005 WL 2146078, at *1.

## III.   Analysis

Plaintiff argues in its motion that Defendant committed trademark infringement pursuant to 15 U.S.C. § 1114 when he displayed an ARRT certification card, containing ARRT's trademark, to potential employers after his certification was revoked. Dkt. No. 16, at 3–4, 6–7. As support for this argument, Plaintiff primarily relies on two cases: *General Electric Co. v. Speicher*, 877 F.2d 531 (7th Cir. 1989) and *Westinghouse Electric Corp. v. General Circuit Breaker & Electric Supply, Inc.*, 106 F.3d 894 (9th Cir. 1997) [hereinafter "*Westinghouse*"]. *Id.* at 4–6. The Court will therefore begin its analysis by considering these and other, similar cases.

As will be seen, however, Plaintiff's proffered precedents do not provide a palatable basis for this Court to reverse its previous decision. Therefore, the Court will also consider the language of and congressional intent behind sections 32 and 43 of the Lanham Act.[1] Next, the Court will apply 15 U.S.C. § 1114(1)(a), as interpreted, to Defendant's conduct. Finally, the Court will discuss how other courts have been engaging in judicial activism by interpreting 15 U.S.C. § 1114 to achieve goals that the courts consider desirable, even though the language of the statute will not support the interpretations attributed to it.

### A. The Language of the Statute

Prior to engaging in a meaningful discussion of the statute, the language of the statute must be provided. The text of section 1114(1)(a) states:

> Any person who shall, without the consent of the registrant—
>       (a) use in commerce any reproduction, counterfeit, copy, or
>       colorable imitation of a registered mark in connection with the sale,

---

[1]Section 32 of the Lanham Act is currently codified, as amended, at 15 U.S.C. § 1114. Section 43 is codified, as amended, at 15 U.S.C. § 1125.

> offering for sale, distribution, or advertising of any goods or
> services on or in connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive; . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter
> provided.

15 U.S.C. § 1114(1)(a).

## B. Plaintiff's Precedent

Plaintiff argues that "[w]hen Defendant Garza's conduct is viewed in light of cases involving [facts analogous to this case], it is clear that his conduct does violate 15 U.S.C. § 1114(a)." Dkt. No. 16, at 4. In support of this argument, Plaintiff specifically points to, and discusses, *Speicher* and *Westinghouse*. *Id*. at 4–6. Based on these cases, Plaintiff avers:

> Defendant Garza was not offering an ARRT "product" or service. Instead,
> he offered his *own* services as a radiological technologist but had,
> figuratively speaking, packaged his services with ARRT's Mark [sic]. The
> likelihood of consumer confusion in such a circumstance is extremely
> high, indeed practically inevitable. By using an actual ARRT card (with
> the ARRT Mark [sic]), a potential employer is almost certain to presume
> that his services are endorsed by ARRT.

*Id*. at 6–7. Thus, ARRT concludes that, because consumer confusion is likely to result, Defendant's conduct violates section 1114. *Id*. at 7.

### 1. *General Electric Co. v. Speicher*

The first case Plaintiff analogizes this case to is *General Electric Co. v. Speicher*. 877 F.2d 531 (7th Cir. 1989). In that case, General Electric Co. ("G.E.") sued the defendant and his company for violations of 15 U.S.C. § 1114 and unfair competition. *See* Gen. Elec. Co. v. Speicher, 676 F.Supp. 1421, 1424 (N.D. Ind. 1988), *rev'd*, 877 F.2d 531 (7th Cir. 1989). The subject matter of the case involved carbide inserts. *Speicher*, 877 F.2d at 532–33. G.E. was the sole manufacturer of a grade 570 insert. *Id*. at 533. Speicher, however, sold his own inserts as a substitute for G.E.'s 570 inserts. *Id*. Initially, Speicher shipped his products in generic white boxes, but he

-4-

eventually switched to boxes containing G.E.'s trademark on the sides. *Speicher*, 676 F.Supp. at 1425. The G.E. boxes were original boxes that had previously been utilized by G.E. *Speicher*, 877 F.2d at 534. G.E. alleged that this conduct, selling substitute products in boxes marked with the G.E. trademark, violated § 1114. *Speicher*, 676 F.Supp. at 1428.

The district court disagreed with G.E.'s arguments. *Id*. According to the district court, the use of "*actual* G.E. boxes" with "*genuine* mark[s]" on them did not constitute a violation of § 1114. *Id*. The Court did, however, find that the defendant had infringed G.E.'s trademark, but under § 1125(a), *not* § 1114.[2] *Id*. at 1428–29; *see also* Gen. Elec. Co. v. Speicher, 681 F.Supp. 1337, 1343–44 (N.D. Ind. 1988), *rev'd*, 877 F.2d 531 (7th Cir. 1989).

On appeal, the Seventh Circuit reversed the district court's decision. *Speicher*, 877 F.2d at 538. The appellate court reasoned that, although the G.E. trademark on the side of each of the boxes was "not a counterfeit in the literal sense," the literal sense was not the "correct one." *Id*. at 534. According to the court, the purpose of § 1114 "is broader [than just the proscription of 'counterfeiting']: to prohibit the use of your trademark on someone else's product without your authorization." *Id*. Thus, the court could

> see no difference, so far as the objectives of section 1114(1)(a) are concerned, between [putting one's good in boxes marked with someone else's genuine trademark] and making a reproduction of GE's trademark. The happenstance of having trademarks made by the owner in one's possession, so that one doesn't have to copy them, has no relevance to the purposes of the statute. Indeed, the danger of confusion is even greater because the "imitation" is not merely colorable, but perfect. The more fundamental point is that the purpose of trademark law is not to guarantee genuine trademarks but to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute.

*Id*. Finally, the court stated that "it is a detail whether the trademark was stolen from the

---

[2]The district court also found that Speicher had engaged in unfair competition. *Speicher*, 676 F.Supp. at 1429.

manufacturer or merely copied." *Id*. at 535.

Although this Court recognizes that a decision from the Seventh Circuit Court of Appeals generally carries substantial precedential authority, this Court cannot accept the reasoning in the *Speicher* case. In the relevant portion of its opinion, the court cited little authority for its analysis. *Id*. at 533–35. The court made wholesale determinations of the "aim" and objectives of section 1114 and declared that there is no difference between copying a trademark and already possessing an original for "the purposes of the statute," but it provided no basis for these decisions. *Id*. at 534. The court failed to consider any legislative history, other versions of the trademark statute, or any other indicia of congressional intent. Nonetheless, the court specifically rejected the literal meanings of the terms of the statute. *Id*. Furthermore, as will be seen, *see infra* § III.B.3, the limited authority provided by the court for its judgment suffers from similar problems. Thus, the Court will not base its decision in this case on *Speicher*.

2. *Westinghouse Electric Corp. v. General Circuit Breaker & Electric Supply Inc.*

The second case relied on by ARRT is *Westinghouse Electric Corp. v. General Circuit Breaker & Electric Supply Inc.* 106 F.3d 894 (9th Cir. 1997). In the case, the defendant admitted it "sold reconditioned breakers bearing the Westinghouse mark without noting they had been reconditioned." *Id*. at 897. Specifically, the defendant would take original circuit breakers, clean them or replace some of their internal components, and resell them. *Id*. "In addition, when the breaker labels were faded or otherwise illegible, the defendants often replaced the labels." *Id*. Replacement labels would be obtained from Westinghouse employees or copied. *Id*. Westinghouse sued under section 1114. *Id*.

The Ninth Circuit's discussion of section 1114 is similar to the analysis in *Speicher*. *Id*. at 899–900. The court began by stating that "[t]he original Westinghouse labels are not themselves 'counterfeits' in the literal sense." *Id*. at 899. Nonetheless, the court found this to be irrelevant, because "the aim of section 1114 is broader than the prohibition of 'counterfeiting.' The statute was intended 'to protect consumers against deceptive designations of the origin of goods,' not just to prevent the duplication

-6-

of trademarks." *Id.* Based on this reasoning, the court held that

> the distinction between using a duplication versus using an original has no
> relevance to the purposes of trademark law. When an original mark is
> attached to a product in such a way as to deceive the public, the product
> itself becomes a 'counterfeit' just as it would if an imitation of the mark
> were attached.

*Id.* at 900. The court continued with a discussion of *Speicher*, before concluding that
trademark law essentially boils down to a single element: "The logic of these holdings is
consistent with the 'keystone' of trademark law: the likelihood of confusion in the minds
of the buying public." *Id.*

With all due deference to the precedential authority of the Ninth Circuit's
opinions, this Court cannot rely on the appellate court's opinion as the basis for its
decision. The Ninth Circuit, like the Seventh Circuit in *Speicher*, rejected the literal
meaning of the terms of the statute. *Id.* at 899. Moreover, this rejection was made
without any consideration of congressional intent. *Id.* The court also ignored the
requirements of the statute beyond causing confusion in consumer's minds, essentially
reading all of the other provisions out of the statute. *Id.* at 899, 900. Finally, the court
provides no explanation for how a product becomes "counterfeit" when a trademark is
illegitimately applied to it or for why this makes a difference to a section 1114 analysis.[3]

---

[3]Reference to "counterfeit goods" in a discussion of trademark infringement
confuses two separate concepts. Section 1114(1)(a) prohibits using "any reproduction,
counterfeit, copy, or colorable imitation *of a registered mark*." It does not in any manner
address counterfeit *goods*. 15 U.S.C. § 1114(1)(a) (emphasis added). The term
"counterfeit" is not an adjective modifying the phrase "goods or services." "Counterfeit"
and "goods and services" simply have no linguistic connection to each other.

The noun "counterfeit" is one of four options for _what_ must be "use[d]" by "[a]ny
person" for the statute to apply to the person's conduct. The prepositional phrase "of a
registered mark" modifies the terms "reproduction, counterfeit, copy, [and] colorable
imitation."

In contrast, the phrase "goods or services" is included within the explanation of
_how_ a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" must
be used for the statute to apply, *i.e.* "in connection with the sale, offering for sale,
distribution, or advertising of any goods or services." 15 U.S.C. § 1114(1)(a). The
phrase "goods or services" is a modifier, limiting the scope of the terms "sale, offering
for sale, distribution, [and] advertising." In the context of the statute, goods and

*Id.* at 900. Thus, the Court also will not base its decision in this case on *Westinghouse*.

### 3. Other Cases

Although ARRT only specifically cites to and discusses *Speicher* and *Westinghouse*, it implies that other cases exist which support its argument that Defendant violated section 1114 in this case. Dkt. No. 16, at 4. Nonetheless, the Court has been unable to locate any authority that does not suffer from the same shortcomings and fallabilities as the cases described above. Rather, every case appears to fall within one or more specific categories of deficiencies, such as reducing section 1114 to nothing more than a test for consumer confusion, *see, e.g.*, *Davidoff*, 263 F.3d at 1300–01, 1302; Burger King Corp. v. Mason, 710 F.2d 1480, 1491–92 (11th Cir. 1983); Cartier v. Aaron Faber Inc., 396 F.Supp.2d 356, 359 (S.D.N.Y. 2005); Hawkins Pro-Cuts, Inc. v. DJT Hair, Inc., No. CA 3-96-CV-1728-R, 1997 WL 446458, *5 (N.D. Tex. July 25, 1997); citing to *Speicher* and/or *Westinghouse* as the main authority for a section 1114 analysis, *see, e.g.*, Taylor Made Golf Co. v. MJT Consulting Group, LLC, 265 F.Supp.2d 732, 741 (N.D. Tex. 2003) [hereinafter "Taylor Made"]; Rolex Watch U.S.A., Inc. v. Meece, No. 3:95-CV-1058-T, 2000 WL 33582648, *3–*4 (N.D. Tex. Jan. 25, 2000); failing to give adequate, or even any, consideration to legislative intent or to the legislative history of the trademark statute, *see, e.g.*, *Davidoff*, 263 F.3d at 1300–02; Nitro Leisure Prods., L.L.C. v. Acushnet Co., 341 F.3d 1356, 1360–65 (Fed. Cir. 2003); *Mason*, 710 F.2d at 1491–93; Green v. Elec. Vacuum Cleaner Co., 132 F.2d 312, 313–15 (6th Cir. 1940); *Cartier*, 396 F.Supp.2d at 358–62; *Taylor Made*, 265 F.Supp.2d at 741–45; *Meece*, 2000 WL 33582648, at *3–*6; and failing to distinguish or differentiate section 1114 and section 1125, *see, e.g.*, *Acushnet Co.*, 341 F.3d at 1361; *Green*, 132 F.2d at 314. Thus, the Court will perform its own analysis of

---

services are merely ancillary articles with which the offending article, the non-genuine trademark, must be used.

This statute prohibits non-genuine trademarks, not non-genuine goods or services. If Congress intended for the statute to prohibit the "sale, offering for sale, distribution, or advertising" of counterfeit goods, it could have done so in a much less ambiguous manner.

the relevant provisions of the trademark statute, rather than rely on the cases cited by ARRT.[4]

## C. Congressional Intent

"In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress." United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 542 (1940); see also United States v. Oregon & C.R. Co., 164 U.S. 526, 539 (1896) ("[T]he construction should be such as will effectuate the legislative intention, avoiding, if possible, an unjust or absurd conclusion."). Of course, the best evidence of Congressional intent is the language employed in the statute itself. See McFarland v. Scott, 512 U.S. 849, 865 (1994) (Thomas, J., dissenting); Am. Trucking Ass'ns, Inc., 310 U.S. at 543. Thus, the Court must begin with the text of the statute. See Carter v. United States, 530 U.S. 255, 271 (2000); Bd. of Educ. of the Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 237 (1990). "If the plain language of the statute is unambiguous, that language is conclusive absent clear legislative intent to the contrary. Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." Lee v. Ernst & Young, LLP, 294 F.3d 969, 976 (8th Cir. 2002) (quoting Dowd v. United

---

[4]The Court has found no precedent which is binding on it, because, although the Fifth Circuit has considered the question of whether section 1114 should be applied to genuine trademarks, it has not issued a holding on the matter. For example, in Rolex Watch USA, Inc. v. Meece, 158 F.3d 816, 826 (5th Cir. 1998), the Fifth Circuit stated: "Because Meece's items in question bore original Rolex trademarks, rather than imitations or copies of those trademarks, they would not seem to be 'counterfeit' in the literal sense." The court then noted that other courts "have found that similar uses of genuine trademarks constitute counterfeiting," citing to Westinghouse and Speicher. Id. Nonetheless, the court did not rule on the issue, as the case was remanded for a determination by the district court in the first instance. Id. at 827. Additionally, the Fifth Circuit has stated that "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement," but it did not specify which section of the trademark statute it infringed. Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co., 514 F.2d 665, 670 (5th Cir. 1975). Thus, this Court is not bound by any controlling authority and will render a decision based upon its own analysis.

Steelworkers, 253 F.3d 1093, 1099 (8th Cir. 2001)); *see also* Bedroc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004); Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000); Pavelic & LeFlore v. Marvel Entm't Group, 493 U.S. 120, 123 (1989); *Am. Trucking Ass'ns, Inc.*, 310 U.S. at 543.  Finally, this inquiry is informed by "the understanding that Congress 'says in a statute what it means and means in a statute what it says there.'" *Hartford Underwriters Ins. Co.*, 530 U.S. at 6 (quoting Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254 (1992)); *see also Bedroc Ltd., LLC*, 541 U.S. at 183 (same).

     The statute unambiguously states the requirements that must be shown to establish a cause of action for trademark infringement under section 1114.  The requirements are that (1) a person, (2) uses, (3) a reproduction, counterfeit, copy, or colorable imitation, (4) of a mark, (5) that is registered, (6) without the registrant's consent, (7) in connection with the sale, offering for sale, distribution, or advertising, (8) of any goods or services, (9) in a manner likely to cause confusion or mistake or to deceive.  15 U.S.C. § 1114(1)(a); *see also Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d at 1009–10; Choice Hotels, Int'l, Inc. v. Westhill Hotels I Ltd., No. Civ.A. 3:95-CV-1470P, 1996 WL 706876, *2–*3 (N.D. Tex. Dec. 4, 1996).  The Court finds no ambiguity in any of these requirements — unless all of them are present, there is no violation of this particular statute.  In addition, the text of the statute consists only of simple, ordinary diction, and, "'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning' at the time Congress enacted the statute."[5] *Bedroc Ltd., LLC*, 541 U.S. at 184 (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)); *see also Mergens*, 496 U.S. at 237.  Thus, trademark infringement under

---

[5]Congress did provide definitions of "counterfeit mark" and "colorable imitation" in the trademark statute. *See* 15 U.S.C. §§ 1116(d)(B), 1127. "Counterfeit mark" is defined, in relevant part, as "a counterfeit of a mark," "a spurious designation," and a "spurious mark." *Id.* "Spurious" is defined as "outwardly similar or corresponding to something without having its genuine qualities: false." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1140 (10th ed. 1997). "Colorable imitation" is defined to include "any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive." 15 U.S.C. § 1127. None of these definitions creates a substantive difference from the ordinary meanings of the terms at issue, however.

section 1114 must involve the use of "a reproduction, counterfeit, copy, or colorable imitation of a registered mark," and not merely the use of a genuine mark on a different product, as "reproduction," "counterfeit," "copy," and "colorable imitation" all require a duplicated image. 15 U.S.C. § 1114(1)(a); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 256, 265, 579, 994 (10th ed. 1997) (defining "copy" as "an imitation, transcript, or reproduction of an original work;" "counterfeit" as a "forgery" or, in verb form, "to make a fraudulent replica of;" "imitation" as "something produced as a copy: counterfeit;" and "reproduction" as "something reproduced: copy").

Nonetheless, the Court must continue its analysis, because this statute, when considered in isolation, would seem to produce an "unreasonable" result, whereby the use of another's genuine trademark on one's own products would not constitute trademark infringement. *See Am. Trucking Ass'ns, Inc.*, 310 U.S. at 543 ("Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' [the Supreme Court] has followed that purpose, rather than the literal words."); *see also* Rector, etc., of Holy Trinity Church v. United States, 143 U.S. 457, 460 (1892). Therefore, the Court must consider the total context of all the provisions of the Lanham Act and the legislative history of the statute. *See Bedroc Ltd., LLC*, 541 U.S. at 185; *Mergens*, 496 U.S. at 238; *Pavelic & LeFlore*, 493 U.S. at 123; *Am. Trucking Ass'ns, Inc.*, 310 U.S. at 542–43, 544.

The legislative history of the Lanham Act provides guidance as to the proper interpretation of section 32(1) (codified as amended at 15 U.S.C. § 1114). *See* S. Rep. No. 79-1333 (1946), *as reprinted in* 1946 U.S.C. Cong. Serv. 1274. The Congressional Comments discuss the two purposes of the trademark statute:

> One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

*Id.* at 1274. Thus, according to the purposes of the Lanham Act, the literal language of

section 1114, which does not prohibit the use of a genuine trademark on goods other than the registrant's, would be unreasonable.  This unreasonableness is ameliorated, however, in the context of section 43(a) of the Act.

The current version of section 43(a) of the Lanham Act is codified at 15 U.S.C. § 1125(a):

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,
>> . . .
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  Under this section, the unauthorized use of another person's genuine mark, registered or not, clearly constitutes trademark infringement.  *Compare id.* (requiring only use of "any word, term, name, symbol, or device," regardless of whether it is registered or even a trademark), *with* 15 U.S.C. § 1114(1)(a) (requiring use of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark").  According to this section, there is no requirement that there be a "reproduction, counterfeit, copy, or colorable imitation."  Instead, all that is required is the use of "any word, term, name, symbol, or device."  15 U.S.C. § 1125(a).  Furthermore, all of the cases considered *supra* in section III.B fall within the ordinary meaning of the language of section 1125(a), as they involve "container[s] for goods" and/or questions of "affiliation" or "sponsorship."  *See, e.g., Westinghouse,* 106 F.3d at 897 (involving affiliation or sponsorship); *Speicher,* 877 F.2d at 532–34 (containers); *Mason,* 710 F.2d at 1484–85 (affiliation or sponsorship).  Thus, the purposes of the Lanham Act are achieved by the combination of sections 32(1) and 43(a).  There is nothing "unreasonable" about the ordinary meaning of section 32(1) (codified at section 1114), at least when it is considered as a part of the Lanham Act as a whole.  The Court finds

-12-

that the use of a genuine trademark cannot violate 15 U.S.C. § 1114(1)(a).

Another basis for the Court's conclusion that the use of a genuine trademark cannot constitute a violation of 15 U.S.C. § 1114(1)(a) can be found in a previous version of the trademark statute. In 1876, Congress enacted "An act to punish the counterfeiting of trade-mark goods and the sale or dealing in of counterfeit trade-mark goods." Act of Aug. 14, 1876, ch. 274, 19 Stat. 141, *invalidated by* The Trade-Mark Cases, 100 U.S. 82 (1879). That statute stated:

> That every person who shall with intent to defraud, deal in or sell, or keep or offer for sale, or cause or procure the sale of, any goods of substantially the same descriptive properties as those referred to in the registration of any trade-mark, pursuant to the statutes of the United States, *to which, or to the package in which* the same are put up, *is fraudulently affixed said trade mark*, or any colorable imitation thereof, calculated to deceive the public, knowing the same to be counterfeit or not the genuine goods referred to in said registration, shall, on conviction thereof, be punished by fine not exceeding one thousand dollars, or imprisonment not more than two years, or both such fine and imprisonment.
>
> Sec. 2. That every person who *fraudulently affixes, or causes or procures to be fraudulently affixed, any trade mark* registered pursuant to the statutes of the United States, or any colorable imitation thereof, calculated to deceive the public, to any goods, of substantially the same descriptive properties as those referred to in said registration, or to the package in which they are put up, knowing the same to be counterfeit, or not the genuine goods, referred to in said registration, shall on conviction thereof, be punished as prescribed in the first section of this act.
>
> Sec. 3. That every person who fraudulently fills, or causes or procures to be fraudulently filled, any package *to which is affixed any trade-mark*, registered pursuant to the statutes of the United States, or any colorable imitation thereof, calculated to deceive the public, with any goods of substantially the same descriptive properties as those referred to in said registration, knowing the same to be counterfeit, or not the genuine goods referred to in said registration, shall, on conviction thereof, be punished as prescribed in the first section of this act.
>
>     . . .
>
> Sec. 5. That any person or persons who shall, with intent to defraud any person or persons, knowingly and willfully make, forge, or counterfeit, or have in his, her, or their possession, or buy, sell, offer for sale, or deal in, any representation, likeness, similitude, copy, or colorable imitation of any private label, brand, stamp, wrapper, engraving, mould, or trade mark, registered pursuant to the statutes of the United States, shall,

upon conviction thereof, be punished as prescribed in the first section of this act.

*Id.* [emphases added].  The importance of this statute is twofold.  First, it specifically proscribes the use of a genuine trademark on or in connection with goods or services other than those of the mark's owner.  When juxtaposed with Lanham Act section 32(1), it becomes all the more apparent that the language of section 1114 does not encompass this behavior.  *Compare id., with* Act of July 5, 1946, Pub. L. No. 79-489, 60 Stat. 427, 437–38 (codified as amended at 15 U.S.C. § 1114(1)(a)).  If Congress had intended for the fraudulent use of genuine trademarks to be included within the meaning of section 1114, it easily could have done so, as seen in the 1876 Act.  Second, the contrast between sections 1–3, which discuss the affixation of genuine trademarks or colorable imitations of trademarks, and section 5, which discusses copies, colorable imitations, and counterfeiting, shows that Congress does not consider non-genuine goods displaying genuine trademarks as equivalent to counterfeit trademarks or colorable imitations or copies of trademarks.

Thus, this Court is "unable to see why any other than their usual meaning should be attributed to the words" "reproduction, counterfeit, copy, or colorable imitation." *Oregon & C.R. Co.*, 164 U.S. at 540.  The obvious meaning of 15 U.S.C. § 1114(1)(a) does not include the affixation of someone else's genuine trademark on one's own goods or the promotion of one's own services through the use of another's genuine trademark.

### C. Defendant's Conduct

The Court now must apply 15 U.S.C. § 1114(1)(a), as interpreted in the preceding section, to Defendant's conduct.  In this case, Defendant used a certification card, originally given to him by ARRT and displaying a genuine ARRT trademark,[6] after

---

[6]ARRT also argues, in a footnote, that "Garza's defacement of the ARRT card renders it not genuine" and that the attempted use of the defaced card therefore constituted a violation of 15 U.S.C. § 1114(1)(a).  Dkt. No. 16, at 4 n.2.  This Court finds that the argument misses the point.  Once the card was revoked, it was no longer

his certification by ARRT had been revoked. Dkt. No. 1, at 4–8. Defendant used a genuine mark, not a reproduction, copy, counterfeit, or colorable imitation of ARRT's trademark. Therefore, a necessary component of § 1114 liability is missing, and Defendant did not violate that section.

## D. Judicial Activism

The Court has now found, in contradiction of the authority supplied by ARRT, that Defendant did not violate 15 U.S.C. § 1114(1)(a). The Court recognizes that it is therefore at odds with several Courts of Appeals. Nonetheless, the Court cannot in good faith continue to perpetuate the judicial activism engaged in by those other courts.

As discussed above, the plain meaning of the statutory text of section 1114 will not support the construction given to it by the courts Plaintiff cites. *See supra* § III.C. In fact, several courts have even recognized this fact, as they state that the marks in issue in those cases were "not a counterfeit in the literal sense." *See, e.g., Speicher*, 877 F.2d at 534; *MJT Consulting Group, LLC*, 265 F.Supp.2d at 741. Despite this recognition, these courts appear to have felt that it was necessary, to fulfill the purposes and to better achieve the policies of the trademark statute, to interpret section 1114(1)(a) to proscribe the use of genuine marks on or in connection with non-genuine goods or services.[7]

This Court, however, is not permitted to engage in such conduct. A court's "task is to apply the text, not improve upon it." *Pavelic & LeFlore*, 493 U.S. at 126; *see also Mergens*, 496 U.S. at 241 (quoting *id.*). "Even if it were entirely certain that [imposing liability under section 1114 for fraudulent use of genuine marks] would more effectively

---

"genuine." Thus, its defacement is irrelevant to the issue of genuineness. Only defacement of that portion of the card bearing the trademark would be relevant. With no defacement of the actual trademark, it was still genuine.

[7]It is unclear why this interpretation would be considered necessary, as the conduct is clearly proscribed by 15 U.S.C. § 1125(a). In fact, the only major difference between violations of these two sections is that violations of section 1114 allow for greater damages and penalties than violations of section 1125 allow. *Compare* 15 U.S.C. § 1114(1)(a), *with* 15 U.S.C. § 1125(a).

achieve the purpose of the [Lanham Act], we would not feel free to pursue that objective at the expense of a textual interpretation as unnatural as" that proposed by ARRT. *Pavelic & LeFlore*, 493 U.S. at 126. "In any event, [this Court] does not sit to assess the relative merits of different approaches to various [trademark issues]. It suffices that the natural reading of the text produces the result [the Court] announce[s]. Achieving a better policy outcome – if what [ARRT] urges is that – is a task for Congress, not the courts." *Union Planters Bank, N.A.*, 530 U.S. at 13; *see also Carter*, 530 U.S. at 263–64, 271, 272; *McFarland*, 512 U.S. at 864, 868–69 (Thomas, J., dissenting).

## IV.     Conclusion

Based on the foregoing, the Court **DENIES** Plaintiff American Registry of Radiologic Technologists' Rule 59(e) Motion to Amend Judgment.  Dkt. No. 16.

DONE at Brownsville, Texas, this ⎰3 day of March, 2007.

Hilda G. Tagle
United States District Judge

-16-